651 A.2d 92

JANICE LEDLEY, PLAINTIFF-APPELLANT, v. WILLIAM PENN LIFE INSURANCE CO., LEONARD C. WEISSBERGER, AND PENN EQUITIES CORP., DEFENDANTS-RESPONDENTS, AND JOHN DOES 1–5, JOHN DOE BEING A FICTITIOUS NAME, DEFENDANTS.

Argued October 11, 1994—Decided January 5, 1995.

630

*George F. Hendricks* argued the cause for appellant (*Hendricks & Hendricks,* attorneys; *Mr. Hendricks,* of counsel; *Patricia M. Love,* on the brief).

*B. John Pendleton, Jr.,* argued the cause for respondent William Penn Life Insurance Co. (*McCarter & English,* attorneys; *Mr. Pendleton* and *Eugene M. Haring,* of counsel; *Mr. Haring* and *Andrew O. Bunn,* on the brief).

*Carol A. Pisano* argued the cause for respondents Leonard C. Weissberger and Penn Equities Corp. (*Lambert & Weiss,* attorneys; *Ms. Pisano, Monroe Weiss,* and *Evan H. Stoller,* of counsel; *Ms. Pisano* and *Mr. Stoller,* on the brief).

The opinion of the Court was delivered by

POLLOCK, J.

This appeal concerns the duties of an insurer and its agent when issuing a policy insuring the life of an insured who misrepresented his health in the policy application. In an unreported opinion, the Appellate Division affirmed the Law Division's grant of motions for summary judgment by defendants, William Penn Life Insurance Co. (William Penn or the insurer); Penn Equities, its general agent; and Leonard Weissberger, an independent insurance agent. We granted certification, 136 *N.J.* 296, 642 *A.*2d 1005 (1994), and now affirm.

We hold that when the insured materially misrepresents his or her health, the insurer, in the absence of knowledge of conflicting facts, does not have a duty to investigate independently the insured's medical history. We further hold that the agent is not liable for negligent completion of the insurance application

when the insured knowingly misrepresents material facts relating to his health.

### —I—

. On March 15, 1990, William Penn issued a $140,000 life insurance policy to Steven Ledley (the insured), effective February 24, 1990. The policy contained a clause stating that it would be incontestable after two years from the date of issue. One month after issuance of the policy, on April 14, 1990, the insured died of heart failure. Plaintiff, Janice Ledley, the beneficiary, submitted a claim to William Penn. Because the death occurred within the period of contestability, William Penn began an investigation that revealed the insured's undisclosed extensive history of thyroid problems. Consequently, William Penn disclaimed coverage because of the insured's equitable fraud.

Plaintiff sued William Penn, Penn Equities, and Weissberger, alleging that Weissberger had negligently completed the application. William Penn counterclaimed, seeking rescission because the insured had materially misrepresented his health in the application.

When completing the application on February 24, 1990, the insured supplied the following answers to Weissberger, who recorded them on the application form:

8. **HAS ANY PERSON PROPOSED FOR INSURANCE EVER HAD:**

i. tumor, cancer, venereal disease, disorder of blood, skin, thyroid or other glands?

Answer: No.

\* \* \* \* \* \* \* \*

k. x-rays, electrocardiograms, blood studies or other diagnostic tests (past 5 years). When, why, by whom, with what results?

Answer: Yes. Blood studies done during physical M. Tillem. 65 East Northfield Road, Livingston N.J. Came back O.K. X-ray—Mountainside Hosp. Bay St. Montclair 1986. Auto accident—check up everything O.K.

1. treatment or consultations with any physician or practitioners, other than as stated above (past 5 years). Give details.

Answer: No.

In an affidavit in support of his motion for summary judgment, Weissberger stated that the insured had related that his thyroid, although enlarged, was normal and did not impair any of his bodily functions. The insured also had told Weissberger that thyroid surgery had been suggested for cosmetic purposes only. According to plaintiff's affidavit filed in opposition to the motion for summary judgment, Weissberger then said: "Well, I'm not going to put it on [the application] because there is not a category there for it. But when they obtain your medical records from the doctor, that information will be included." Plaintiff concedes, however, that the insured responded negatively to questions 8k and l. She also concedes that the insured falsely answered "no" to question 8i, which inquired about the existence of venereal disease. Contrary to the insured's negative response, he had been treated for gonorrhea.

The insured also had an extensive history of thyroid problems. In 1989, he had been examined by an internist, Dr. Michael Tillem, who referred him to Dr. Dikengil for a series of thyroid-function tests: a thyroid-uptake study, thyroid scintigraphy, and thyroid ultrasound. The tests revealed probable nodules in the right and left lobe of the thyroid, which led Dr. Dikengil to suggest further evaluation. Dr. Tillem also referred the insured to Dr. Howard M. Berg, a specialist in otolaryngology, for consultation concerning the insured's thyroid goiter. In a January 23, 1990, letter from Dr. Tillem, he and Dr. Berg recommended "surgical removal of part of your thyroid so that the sections in question may be sent to the lab for analysis to rule out any cancerous growth." The letter also expresses the concern of both doctors that the "two nodules may represent bleeding into the goiter or quite possibly a thyroid cancer."

The insured, however, decided not to undergo the surgery on the advice of his sister, a pre-medical student. She advised the insured to control his thyroid condition by monitoring his intake of iodine. One month after receiving Dr. Berg's letter recommend-

ing surgery, the insured met with Weissberger to complete the life insurance application.

In support of its motion for summary judgment to rescind the policy, William Penn submitted an affidavit by Derek Rice, a senior life underwriter. Rice concluded that if the insured had disclosed his thyroid goiter and "cold," or possibly malignant, nodules, William Penn would not have issued the policy. The Law Division found that the insured had materially misrepresented his thyroid condition and had failed to disclose the names of consulting physicians. Further, the court found that the insured's misrepresentations about a possible thyroid malignancy entitled the insurer to rescind the policy.

In opposition to Weissberger's motion for summary judgment, plaintiff submitted a report by an insurance expert who concluded that Weissberger should have reported the insured's enlarged thyroid to the insurer and should have advised the insured to answer "yes" to question 8i concerning the existence of a thyroid disorder. The trial court concluded that plaintiff had failed to raise a factual issue whether Weissberger had led the insured to believe the insurer would investigate his medical records.

The Appellate Division likewise found that the insured's failure to disclose his various thyroid tests and consultations with physicians other than Dr. Tillem constituted material misrepresentations. It concluded that William Penn was not under a duty to investigate the insured's medical history because it did not possess sufficient facts to prompt an independent inquiry. The court noted that the policy expressly states: "[N]o information as to any matter made a subject of inquiry [in the application] ... shall be considered known by the Company unless set out in writing on this application." Because the application failed to disclose any information about the insured's thyroid condition, William Penn had no reason to make further inquiries.

The Appellate Division similarly determined that Weissberger had not been negligent. Because the insured had provided false information by concealing his various thyroid tests and consulta-

tions with Dr. Berg, Weissberger was not guilty of negligent completion of the insurance application.

Before us, plaintiff does not challenge the materiality or falsity of the insured's answers on the application. Nor does she contend that Weissberger's knowledge should be attributed to William Penn. Instead, she claims that Weissberger negligently completed the insurance application and that the insurer failed to investigate the insured's medical condition.

–II–

[3] We begin our review of the grant of defendants' motions for summary judgment by recognizing that we should consider the facts in the light most favorable to plaintiff. *Judson v. Peoples Bank & Trust Co.,* 17 *N.J.* 67, 75, 110 *A.2d* 24 (1954).

A court may order rescission of a life insurance policy for equitable fraud even after the death of the insured. *Formosa v. Equitable Life Assurance Soc'y,* 166 *N.J.Super.* 8, 13, 398 *A.2d* 1301 (App.Div.1979), *certif. denied,* 81 *N.J.* 53, 404 *A.2d* 1153 (1979). Within the statutory two-year period of contestability, *N.J.S.A.* 17B:25–4, an insurer may contest a policy for equitable fraud, whether the insured is alive or dead. *Ibid.* Even after the expiration of the contestability period, an insurer may deny a claim if the insured committed fraud in the policy application. *Paul Revere Life Ins. Co. v. Haas,* 137 *N.J.* 190, 644 *A.2d* 1098 (1994). To rescind a policy, an insurer need not show that the insured actually intended to deceive. *Massachusetts Mut. Life Ins. Co. v. Manzo,* 122 *N.J.* 104, 114, 584 *A.2d* 190 (1991). Even an innocent misrepresentation can constitute equitable fraud justifying rescission. *Metropolitan Life Ins. Co. v. Tarnowski,* 130 *N.J.Eq.* 1, 3–4, 20 *A.2d* 421 (E. & A.1941).

Equitable fraud, however, distinguishes between subjective and objective questions on the application. See *Formosa, supra,* 166 *N.J.Super.* at 18, 398 *A.2d* 1301 (concluding that insured's knowingly false reply to subjective question whether insured had

ever been treated for or had any known indication of diabetes constituted equitable fraud); *Russ v. Metropolitan Life Ins. Co.,* 112 *N.J.Super.* 265, 271, 270 *A.*2d 759 (Law Div.1970) (holding that questions relating to past physician consultations and intake of prescribed medication were objective questions); *Colonial Life Ins. Co. of America v. Mazur,* 25 *N.J.Super.* 254, 259–61, 96 *A.*2d 95 (Ch.Div.1953) (finding no claim for equitable fraud because defendant had provided truthful responses to subjective questions relating to whether proposed insured had any deformity or abnormal condition, to whether any doctor had ever expressed any unfavorable opinion concerning proposed insured's health, and to proposed insured's state of health). Objective questions call for information within the applicant's knowledge, "such as whether the applicant has been examined or treated by a physician." *Formosa, supra,* 166 *N.J.Super.* at 15, 398 *A.*2d 1301. In contrast, subjective questions "seek to probe the applicant's state of mind." *Ibid.* They are concerned with more ambiguous issues, such as "what is the state of the applicant's health or whether the applicant has or has had a specified disease or illness." *Ibid.* Courts have been more lenient when reviewing an applicant's misrepresentation made in response to a subjective question than to an objective question. The rationale behind the distinction between objective and subjective questions is that the answer to a subjective question will not constitute equitable fraud if "the question is directed toward probing the knowledge of the applicant and determining the state of his mind and . . . the answer is a correct statement of the applicant's knowledge and belief. . . ." *Ettelson v. Metropolitan Life Ins. Co.,* 164 *F.*2d 660, 665 (3d Cir.1947); *see also* 1A John A. Appleman & Jean Appleman, *Insurance Law and Practice* § 246, at 129 (1981) (Appleman) (noting that in New Jersey, "the applicant's knowledge of the falsity of his representations is material only as respects 'subjective questions' ").

We agree with the Appellate Division's characterization of question 8i as subjective; the question inquired whether the insured suffered from a thyroid "disorder." Plaintiff testified on

deposition that the insured had told Weissberger that he had a "normal," albeit enlarged, thyroid. She further stated that the insured's sister had informed him that his thyroid condition did not affect any of his "normal thyroid functions" and could be controlled by increasing his iodine intake. Giving the insured the benefit of all favorable inferences, as we must, the insured could have believed that his enlarged thyroid, which functioned normally, was not a "disorder." So viewed, the insured merely provided a response that reflected his own belief about his thyroid condition.

The answers to questions 8k and 1 lead to a different conclusion. Question 8k required disclosure of any "diagnostic" tests performed in the last five years. Question 8l required disclosure of any "consultations" with physicians other than Dr. Tillem. Answers to those questions do not call for personal opinion. The questions merely requested the facts relating to diagnostic tests on the insured and to physicians he had consulted. When a question is unambiguous and calls for a statement of fact, misrepresentation or concealment is inexcusable. *Stango v. Metropolitan Life Ins. Co.,* 10 *N.J.Misc.* 1128, 1129, 162 *A.* 533 (Sup.Ct.1932) (holding that question asking "[w]hen last sick" clearly asked for statement of fact). As Appleman states: "Questions contained in an application for personal insurance concerning past medical treatment, consultation and the like ordinarily are of the gravest importance, and, within reason, it is necessary that full, complete and truthful answers be given by the applicant." § 271, at 216. Questions 8k and 1 are therefore "objective" questions. Remaining is the determination whether the insured's misrepresentations are material.

In the lower courts, plaintiff questioned whether the insured's misrepresentations were material. Although petitioner has not specifically pressed the point before us, we conclude, as did the lower courts, that the misrepresentations were material.

An insured may rescind a policy for equitable fraud when the false statements "materially affected either the acceptance of the

risk or the hazard assumed by the insurer." *N.J.S.A.* 17B:24–3(d). A misrepresentation is material if it " 'naturally and reasonably influence[d] the judgment of the underwriter in making the contract at all, or in estimating the degree or character of the risk, or in fixing the rate of premium.' " *Manzo, supra,* 122 *N.J.* at 115, 584 *A.*2d 190 (quoting *Kerpchak v. John Hancock Mut. Ins. Co.,* 97 *N.J.L.* 196, 198, 117 *A.* 836 (E. & A.1922)).

In this case, the insured misrepresented his health by supplying false responses to 8k and l. In response to 8k, which inquired about diagnostic tests within the past five years, the insured failed to reveal the battery of thyroid tests he had undergone the previous year. Moreover, he falsely responded that his test results from Dr. Tillem had "come back ok" when, in reality, the thyroid-scan test had revealed nodules and the possibility of cancer in the thyroid gland.

The insured also falsely answered "no" in response to question 8l, which asked for the names of other physicians consulted within the past five years. Although the insured represented that he had not consulted physicians other than Dr. Tillem, the insured's medical records indicate that he had consulted two other physicians within three months of the date of the issuance of the policy. Moreover, both Dr. Tillem and Dr. Berg, fearing that the insured's thyroid condition might be cancerous, had recommended surgery. Indeed, Dr. Tillem sent his letter recommending surgery just one month before the insured applied for insurance.

Based on the insured's application and the results of his blood-chemistry and urinalysis tests, William Penn decided not to order an attending physician's statement. If William Penn had ordered such a statement from Dr. Tillem, the insured's personal physician, it would have obtained information revealing the insured's thyroid condition. Instead, William Penn relied on the insured's misrepresentations. According to senior underwriter Rice, William Penn would not have issued the policy if it had known of the insured's thyroid and cold nodules. Because William Penn materi-

ally relied on the insured's misrepresentations, it may rescind the policy because of the insured's equitable fraud.

■ Plaintiff also argues that if William Penn had investigated the insured's medical history, it would have learned of his thyroid condition. Specifically, plaintiff asserts that William Penn should have inquired further about the insured's blood-test results and that it should have requested an attending physician's statement from Dr. Tillem. We disagree.

■ An insurer's duty to investigate further arises "only when the independent investigation ... discloses sufficient facts to seriously impair the value" of the application. *Gallagher v. New Eng. Mut. Life Ins. Co.*, 19 *N.J.* 14, 22, 114 *A.2d* 857 (1955). Moreover,

> [t]he mere fact that an insurer makes an investigation does not absolve the applicant from speaking the truth nor lessen the right of the insurer to rely upon his statements, unless the investigation discloses facts sufficient to expose the falsity of the representations of the applicant or which are of such a nature as to place upon the insurer the duty of further inquiry.
>
> [*John Hancock Mut. Life Ins. Co. of Boston v. Cronin*, 139 *N.J.Eq.* 392, 398, 51 *A.2d* 2 (E. & A.1946).]

Consequently, the *Cronin* court concluded that an insurer's duty to investigate is limited.

■ Here, the insured's blood and urine tests did not reveal any information that contradicted or even hinted at the falsity of his representations. The tests merely confirmed the insured's misrepresentations. Moreover, the policy expressly provided that "no information as to any matter made a subject of inquiry [in the application] ... shall be considered known by the Company unless set out in writing on this application." That clause precludes imputing to William Penn any information told to Weissberger, but not included in the application. Nothing in the application suggested that the insured had a thyroid condition for which he had undergone extensive diagnostic testing. Consequently, William Penn had no reason to conduct a separate inquiry.

–III–

■ An insurance agent should exercise good faith and reasonable skill in advising an insured. *Weinisch v. Sawyer*, 123 *N.J.* 333, 340, 587 *A.2d* 615 (1991). Similarly, the insured should "disclose all facts relating to his general health in the application when such information is requested. It is he and' he alone who has the necessary complete knowledge of such facts...." *Gallagher, supra*, 19 *N.J.* at 22, 114 *A.2d* 857.

■ Plaintiff contends that Weissberger negligently advised the insured by failing to record on the application the insured's thyroid was enlarged, by neglecting to advise the insured that he should have answered "yes" to the question about whether he had a thyroid disorder, and by improperly telling the insured that William Penn would obtain his medical records from his doctor. According to plaintiff, the insured did not disclose his diagnostic tests and other physician consultations because he believed William Penn would otherwise learn the full details of his medical history. Furthermore, plaintiff asserts that if William Penn had requested the insured's medical records, it would have either rejected the application or accepted it at a higher premium. Consequently, plaintiff concludes that Weissberger breached a duty he owed to the insured.

■ We conclude, however, that Weissberger did not breach any such duty. Weissberger accurately recorded the insured's answers on the application. As plaintiff testified on deposition:

Q. Do you remember Mr. Weissberger asking your husband question number 8, "Has any person proposed for insurance ever had shortness of breath, chronic hoarseness or coughed blood, spitting?" and your husband replying "No."

A. I remember whatever is on there. I remember him asking the questions and then he would have said yes or no if it applied to him.

Q. And Mr. Weissberger put down yes or no?

A. Whatever my husband's response.

Q. Whatever your husband's response?

A. Yes.

Moreover, we must consider Weissberger's alleged statement that William Penn would review the insured's medical history in light of the insured's misrepresentations. The insured misrepresented that he did not have a thyroid condition and that he had not consulted any other physicians within the past five years. Knowing that he might have cancer, the insured nonetheless told Weissberger that his diagnostic tests were "O.K." Plaintiff's deposition reveals that the insured knew that his thyroid condition was serious:

> Q. Now, tell me, Miss Ledley, you said that Mr. Weissberger asked you some questions and you discussed at that time this thyroid bump that your husband had on his neck. Prior to that meeting with Mr. Weissberger had you ever discussed with your husband his thyroid bump?
>
> A. Yes, I have.
>
> Q. And how long prior to that meeting had you discussed it with him?
>
> A. After he came back from his tests with the second physician we discussed it at that time.
>
> Q. And what did he say to you and what did you say to him?
>
> A. He told me that he had that thyroid function and they would like to have surgery done for the tests to make sure it's not cancerous, that lump. And he asked me how I felt about it.

The uncontroverted affidavit of William Penn's underwriter states that had William Penn known of the insured's thyroid history, it would not have issued the policy. In that setting, we find no issue of material fact supporting plaintiff's argument that Weissberger's negligence, rather than the insured's misrepresentations, caused William Penn to issue the policy. We cannot hold Weissberger responsible when the insured's knowing misrepresentations caused William Penn to issue the policy.

–IV–

 The lower courts correctly recognized that this case is ripe for summary judgment. As Justice Brennan wrote forty years ago,

> [Summary judgment] is designed to provide a prompt, businesslike and inexpensive method of disposing of any cause which a discriminating search of the merits in the pleadings, depositions and admissions on file, together with the affidavits submitted

on the motion clearly shows not to present any genuine issue of material fact requiring disposition at a trial.

[*Judson, supra,* 17 *N.J.* at 74, 110 *A.2d* 24.]

*See also Report to the Governor on the Subject of Tort Reform* at 8 (Sept. 13, 1994) (advocating "the use of the summary judgment process for disposing of meritless cases"). Here, the insured's false statements established his equitable fraud. Both the insurer and the agent relied on those statements in issuing the policy. A misrepresentation about the applicant's state of health is material as a matter of law, and proof of the falsity of the misrepresentation will allow the defrauded party to void the contract. Appleman, *supra,* § 244 at 119.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—None.